Justice Ginsburg,
dissenting.
Although the question is close, I would uphold the determinations of the courts below that Shell qualifies as an arranger within the compass of the Comprehensive Envi *621 ronmental Response, Compensation and Liability Act (CERCLA). See 42 U.S.C. §9607(a)(3). As the facts found by the District Court bear out, App. to Pet. for Cert, in No. 07-1601, pp. 113a-129a, 208a-213a, Shell “arranged for disposal... of hazardous substances” owned by Shell when the arrangements were made.[1]
In the 1950’s and early 1960’s, Shell shipped most of its products to Brown and Bryant (B&B) in 55-gallon drums, thereby ensuring against spillage or leakage during delivery and transfer. Id., at 89a, 115a. Later, Shell found it economically advantageous, in lieu of shipping in drums, to require B&B to maintain bulk storage facilities for receipt of the chemicals B&B purchased from Shell. Id., at 115a. By the mid-1960’s, Shell was delivering its chemical to B&B in bulk tank truckloads. Id., at 89a, 115a. As the Court recognizes, “bulk storage of the chemical led to numerous tank failures and spills as the chemical rusted tanks and eroded valves.” Ante, at 603, n. 1.
Shell furthermore specified the equipment to be used in transferring the chemicals from the delivery truck to B&B’s storage tanks. App. to Pet. for Cert, in No. 07-1601, pp. 120a-122a, 124a.[2] In the process, spills and leaks were inevitable; indeed spills occurred every time deliveries were made. 520 F. 3d 918, 950-951 (CA9 2008). See also App. *622 to Pet. for Cert, in No. 07-1601, pp. 119a-122a, ¶ 142 (“It is undisputed that spills were inherent in the delivery process that Shell arranged .. ..”).
That Shell sold B&B useful products, the Ninth Circuit observed, did not exonerate Shell from CERCLA liability, for the sales “necessarily and immediately resulted] in the leakage of hazardous substances.” 520 F. 3d, at 950. The deliveries, Shell was well aware, directly and routinely resulted in disposals of hazardous substances (through spills and leaks) for more than 20 years. “[M]ere knowledge” may not be enough, ante, at 613, but Shell did not simply know of the spills and leaks without contributing to them. Given the control rein held by Shell over the mode of delivery and transfer, 520 F. 3d, at 950-951, the lower courts held and I agree, Shell was properly ranked an arranger. Relieving Shell of any obligation to pay for the cleanup undertaken by the United States and California is hardly commanded by CERCLA’s text, and is surely at odds with CERCLA’s objective — to place the cost of remediation on persons whose activities contributed to the contamination rather than on the taxpaying public.
As to apportioning costs, the District Court undertook a heroic labor. The Railroads and Shell, the court noted, had pursued a “ ‘scorched earth,’ all-or-nothing approach to liability. Neither acknowledged an iota of responsibility .... Neither party offered helpful arguments to apportion liability.” App. to Pet. for Cert, in No. 07-1601, p. 236a, ¶ 455. Consequently, the court strived “independently [to] perform [an] equitable apportionment analysis.” Id., at 237a, ¶455. Given the party presentation principle basic to our procedural system, Greenlaw v. United States, 554 U. S. 237, 243-244 (2008), it is questionable whether the court should have pursued the matter sua sponte. See Castro v. United States, 540 U. S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment) (“Our adversary system is designed around the premise that the parties know what is *623 best for them, and are responsible for advancing the facts and arguments entitling them to relief.”). Cf. Kaplan, von Mehren, & Schaefer, Phases of German Civil Procedure I, 71 Harv. L. Rev. 1193,1224 (1958) (describing court’s obligation, under Germany’s Code of Civil Procedure, to see to it that the case is fully developed).
The trial court’s mode of procedure, the United States urged before this Court, “deprived the government of a fair opportunity to respond to the court’s theories of apportionment and to rebut their factual underpinnings — an opportunity the governmen[t] would have had if those theories had been advanced by petitioners themselves.” Brief for United States 41.[3] I would return these cases to the District Court to give all parties a fair opportunity to address that court’s endeavor to allocate costs. Because the Court’s disposition precludes that opportunity, I dissent from the Court’s judgment.

 “Disposal” is defined in 42 U.S.C. §6903(3) to include “spilling [or] leaking” of “any . . . hazardous waste into or on any land or water so that [the] . . . hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters.”

 Shell shipped the chemicals to B&B “F.O.B. Destination.” At oral argument, the Court asked Shell’s counsel: Suppose there had been “no transfer of ownership until the delivery [was] complete?” In that event, counsel responded, “Shell would have been the owner of the waste.” Tr. of Oral Arg. 8. The Court credits the fact that at the time of the spills, the chemicals, having been shipped “F.O.B. Destination,” “had come under B&B’s stewardship.” Ante, at 612. In my view, CERCLA liability, or the absence thereof, should not turn, in any part, on such an eminently shipper-fixable specification as “F.O.B. Destination.”

 For example, on brief, the United States observed: “[P]etitioners identify no record support for the district court’s assumption that each party’s contribution to the overall harm is proportional to the relative volume of hazardous substances attributable to it.” Brief for United States 45. And at oral argument, counsel for the United States stressed that the District Court “framed the relevant inquiry as what percentage of the contamination was attributable to the railroad parcel, to the Shell-controlled deliveries, and to the B&B parcel. But it made no finding . .. as to what the cost of [remediation] would have been ... if the only source of contamination had been the railroad parcel.” Tr. of Oral Arg. 52. See also id., at 56 (“[T]he crucial question is what response costs the government would have been required to bear ... if only the railroad parcel’s contamination had been at issue ....”).